**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**David Valasquez ACOSTA,**
**Defendant-Appellant.**

**No. 73–1732.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 21, 1974.

Decided April 22, 1974.

E. Edward Johnson, Asst. U. S. Atty. (Robert J. Roth, U. S. Atty., and Thomas A. Hamill, Asst. U. S. Atty., on the brief), for plaintiff-appellee.

Lynn R. Johnson, Kansas City, Kan., for defendant-appellant.

Before BREITENSTEIN, SETH, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

David Velasquez Acosta was charged with unlawfully conveying from place to place within the United States Penitentiary at Leavenworth, Kansas, a thing designed to kill, injure or disable an employee, officer, agent or inmate thereof, to wit: a homemade knife, in violation of 18 U.S.C. § 1792. His first trial on that charge ended in a mistrial as the result of a hung jury.

Acosta was then tried six months later on the same charge, and this time the jury convicted. On appeal Acosta now asserts that the trial court erred in three particulars: (1) in refusing to grant his motion for acquittal made at the close of the Government's case and renewed at the close of all the evidence, which motion was based on the alleged lack of evidence that he, Acosta, conveyed a knife from "place to place" within the penitentiary as contemplated by 18 U.S.C. § 1792; (2) in denying his request for a copy of the transcript of the testimony given at the first trial of his case; (3) in sentencing him to a three-year term of imprisonment to be served consecutively with any other sentence he was then serving, when he had previously received administrative punishment for the same transaction, all of which, according to Acosta, constitutes double jeopardy.

In our view, the failure of the trial court to give Acosta a copy of the transcript of the testimony given at his first trial constitutes reversible error. Since our disposition of the matter may conceivably result in a third trial on this matter, we shall consider all matters raised on appeal. Brief reference to the evidence adduced upon trial will place this appeal in context.

The Government's evidence showed that Acosta walked from a point within and somewhere near the center of the west storeroom of the penitentiary to a point at the rear of the storeroom where a latrine area had been partitioned off from the rest of the storeroom by a five-foot partition. More particularly, three employees of the penitentiary went to the west storeroom for the purpose of escorting Acosta, who was assigned to work in the west storeroom, to the administrative office for questioning. When they confronted Acosta inside the west storeroom, Acosta was carrying a gallon jar filled with ice in each hand. When informed that he was to go to the administrative office, Acosta asked if he could "put the jars away?" When told that he could, Acosta walked some fifteen feet towards the latrine area, with one of the penitentiary employees, Carl Mills, at his elbow. Going inside the partitioned latrine area, Acosta, according to the penitentiary employee who had followed him, placed the jars of ice on a table, and then reached into his rear pocket and took out a homemade knife and dropped it into a cardboard box filled with toilet tissue. The employee thereupon told Acosta to "step away" and he then retrieved the knife. Thus, the Government's case was based

entirely on the testimony of these three penitentiary employees, with particular reliance on the testimony of Carl Mills, who was the one who actually followed Acosta into the latrine area and was the only one who saw Acosta take the knife from his pocket and drop it into the box.

Acosta testified in his own behalf, and the gist of his testimony was that he was being framed. Acosta denied having a knife on his person or dropping one into the box, and it was his belief that the penitentiary employee actually had the knife in question on his own person, and falsely accused him of carrying the knife into the latrine area and then dropping it into the box. Several fellow inmates supported, in varying degrees, Acosta's version of the incident. With this background we shall now examine each of the matters urged on appeal.

■ In our view the Government's evidence is sufficient to show that there was a conveying of the knife from "place to place" within the penitentiary to bring the instant case within the purview of 18 U.S.C. § 1792. Accordingly, the trial court did not err in denying Acosta's motion for acquittal made at trial. The Government's evidence tended to show that Acosta conveyed a knife some fifteen feet, at least, into and inside a partitioned latrine area in the rear of the west storeroom where he attempted to unload the weapon by dropping it into a box filled with toilet issue. Such evidence is sufficient to establish a violation of 18 U.S.C. § 1792. We believe our conclusion in this regard is in accord with the rationale of our prior decisions relating to the meaning to be given the phrase "place to place." *See* United States v. Swindler, 476 F.2d 167 (10th Cir. 1973), cert. denied, 414 U.S. 837, 94 S.Ct. 183, 38 L.Ed.2d 72 (1973); United States v. Hedges, 458 F.2d 188 (10th Cir. 1972); United States v. Meador, 456 F.2d 197 (10th Cir. 1972); and United States v. Bedwell, 456 F.2d 448 (10th Cir. 1972).

In *Swindler,* for example, a conveyance from a sanding machine in the carpenter's shop to an office some fifty feet away was held to be conveyance from "place to place." In *Swindler,* we indicated a conveyance from "place to place" need not necessarily be for a long distance, and could be for even a "short space." In *Meador,* a conveyance of a knife from a cell to the front of the cell house, a distance of 100 yards, was held to be a conveyance from place to place.

Counsel's reliance on *Bedwell* as dictating a reversal is misplaced. In *Bedwell* we held that the act of running a blade across a sander and then allowing the blade to drop to the floor was not conveying the blade from place to place within the penitentiary. We also held in *Bedwell* that the "other" evidence in that case was insufficient to permit the inference that, based on "present" possession, there had been a "prior" or "earlier" conveying of the blade in question. The present case is factually dissimilar from *Bedwell* in important particulars. Here, the Government's evidence, which the jury chose to believe, showed that Acosta, with a gallon jar of ice in each hand and with a knife in his hip pocket, which knife necessarily had been placed there sometime before he was first confronted by the prison authorities in the west storeroom, walked some fifteen feet into and inside the partitioned latrine area where he attempted, unsuccessfully, to unload the knife. Such constitutes a conveyance from place to place within the meaning of 18 U.S.C. § 1792.

■ We shall next consider Acosta's claim that the penalty imposed in the instant case constitutes double jeopardy since he had already suffered administrative punishment at the hands of prison officials for the same transaction. This argument has been considered by us before and rejected. It is well established in this Circuit that administrative punishment imposed by prison officials does not render a subsequent judicial proceeding, criminal in nature, violative

of the Fifth Amendment prohibition of double jeopardy.

We now come to Acosta's contention that the trial court erred in denying his request for a free transcript of his first trial, which, as mentioned earlier, resulted in a mistrial when the jury was unable to agree. The facts concerning this particular phase of the case should be developed a bit. The first trial ended in a mistrial on December 14, 1972. On January 12, 1973, counsel for Acosta filed a motion for a transcript of the testimony given at the first trial. This motion was denied by the trial court, without comment, on January 22, 1973. The case thereafter came on for a second trial on June 11, 1973, which resulted in a verdict of guilty returned by the jury on June 12, 1973.

 In his motion for a new trial made after his conviction in the second trial, Acosta, through his attorney, asserted that the key Government witness, Carl Mills, had committed perjury, and that accordingly it was error for the trial court to have previously denied his motion for a transcript. This motion was denied.

In his cross-examination of the Government's three witnesses at the second trial, counsel for Acosta was permitted, by ruling of the trial court, to inquire of each as to whether the witness had "testified to such and such at a prior hearing in this matter." In connection with the form of question thus approved, the trial court stated that as far as the witnesses' answers thereto were concerned, "whatever they say, that will be it." In framing his cross-examining questions, counsel was permitted to use notes taken by him at the first trial, although he was cautioned not to apprise the jury that he was using notes in the framing of his questions. Under the circumstances as above outlined, we conclude that the trial court erred in denying Acosta's request for a transcript of his first trial.

 Resolution of this phase of the present controversy is in our view large-ly governed by Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). We recognize that in *Britt* the party seeking a transcript was a defendant in a state criminal proceeding, and the Supreme Court was accordingly there concerned with the equal protection clause of the Fourteenth Amendment, whereas Acosta is a defendant in a federal criminal proceeding, bringing into play the due process clause in the Fifth Amendment. However, there is no suggestion that the rule should be different in a federal criminal proceeding, than in a state one. Indeed, both counsel in the present case rely on the same case, namely, *Britt*. In this regard *see* such cases as Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and United States v. Craven, 478 F.2d 1329 (6th Cir. 1973), cert. denied, 414 U.S. 866, 94 S.Ct. 54, 38 L. Ed.2d 85 (1973), where it was noted that though the Fifth Amendment contains no equal protection clause, as such, it nonetheless does forbid discrimination which is "so unjustifiable" as to be violative of due process.

In *Britt*, the defendant's first trial ended in a mistrial because of the inability of the jury to agree. Defense counsel then moved for a free transcript of the first trial, which motion was denied. A month later the defendant was convicted in a second trial of the matter and the denial of his request for a free transcript of his first trial was upheld on appeal by the North Carolina Court of Appeals. Britt v. North Carolina, 8 N. C.App. 262, 174 S.E.2d 69 (1970). On certiorari, the Supreme Court affirmed, but did so on a very narrow ground that in our view has no applicability to the present factual situation.

In *Britt*, the United States Supreme Court first declared that the basic doctrine of Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and its progeny, that the State must provide indigent prisoners with the same basic tools which are available to more affluent prisoners, had application to the facts of *Britt*, and that accordingly a

64

State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense at a second trial. Furthermore, in connection with such a request for a free transcript, the Court stated that the movant need not himself show "particularized need" for the transcript nor did he have the burden of showing the inadequacy or unavailability of so-called "alternative devices" which could serve the same function as a transcript.

Notwithstanding these strong pronouncements, the Supreme Court in *Britt* nonetheless held that there was no error by the trial court in denying the request for a free transcript because counsel for Britt in argument before the Supreme Court *conceded* that he did in fact have available an informal alternative which appeared to be the functional equivalent of a transcript. The informal alternative in *Britt* was a friendly small-town court reporter who was apparently available and, more importantly, inclined to read back, free of charge, to counsel all of the testimony given at the first trial, had he been requested to do so. The difference between *Britt* and the instant case is that here there is no such *concession* by counsel. To the contrary, he asserts that the court reporter was not of the same disposition as the court reporter in *Britt*. Our reading of *Britt* leads us to conclude that Acosta should have been given a copy of the transcript of his first trial. In support of our conclusion *see,* in addition to *Britt,* such cases as Roberts v. LaVallee, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967); United States v. Young, 472 F.2d 628 (6th Cir. 1972); United States ex rel. Wilson v. McMann, 408 F.2d 896 (2d Cir. 1969); and Peterson v. United States, 351 F.2d 606 (9th Cir. 1965).

The cases above cited uniformly recognize the value of having a transcript of the first trial in connection with preparing for a second trial of the same case. It is not only a tool to be used for impeachment purposes at the second trial, but, perhaps more importantly, it is a tool to be used in preparing for trial, particularly in framing the cross-examining question to the end that such may lead to impeachment. And in *Britt,* the Supreme Court "doubted" that providing a defendant during the course of the second trial with limited access to the court reporter at the first trial was an informal equivalent to a transcript of the first trial. We share the same doubt.

Although we do not turn our decision on this aspect of the case, there is the statement in appellant's brief that during the second trial Government counsel did in fact have in his possession a copy of the transcript, he having apparently ordered the same from the court reporter, whereas Acosta's request in the same connection had been turned down by the trial court. If such be the case, and we are uncertain on the matter, such would of course be a far cry from fair play. However, whether the Government itself had a copy of the transcript of the first trial is not controlling. We do know that a financially solvent accused in the same situation as Acosta would have ordered a transcript of the first trial as a necessary step in readying for his second trial. And, as was said in Roberts v. LaVallee, *supra,* the Supreme Court for more than a decade has made clear that differences in access to instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution.

Judgment reversed and cause remanded with directions that if the Government be inclined to retry Acosta, he be given a transcript of his first trial. We see no need to direct that Acosta be given a copy of the testimony at his second trial. Such is in the record now before us, and that record will be available for use by counsel prior to further proceedings.