Susan Jane B. GILFILLAN et al.

v.

CITY OF PHILADELPHIA et al.

Civ. A. No. 79-3377.

United States District Court,
E. D. Pennsylvania.

Nov. 9, 1979.

Henry W. Sawyer, III, Drinker, Biddle & Reath, Philadelphia, Pa., for Gilfillan and American Civil Liberties Union.

John T. Acton, Willow Grove, Pa., for intervenors.

Sheldon L. Albert, City Sol., Philadelphia, Pa., for City of Philadelphia.

Earl W. Trent, Jr., National Ministries, American Baptist Churches in the United States of America, Valley Forge, Pa., for Forehand and American Baptist Churches.

**MEMORANDUM**

RAYMOND J. BRODERICK, District Judge.

Never before in the history of the City of Philadelphia have a million people peacefully assembled to hear a man of God proclaim the gospel of love and man's need to live with freedom and dignity. The visit of Pope John Paul II on October 3 and 4, 1979 brought a unique honor to the City of Philadelphia and inspired feelings of fellowship and good will which transcended all sectarian lines. The officials of the City of Philadelphia are to be commended for the beautiful setting which they created for this historic event, and for the skillful planning and management which permitted the vast crowd to assemble in safety and comfort.

The issue before this Court, however, involves only one narrowly defined aspect of the Pope's visit to Philadelphia. Plaintiffs have clearly stated from the outset that they do not challenge the celebration of a Roman Catholic Mass on public property; nor do they contest expenditures for security and crowd control required for the visit of any public figure of the Pope's stature. The issue presented to this Court is whether or not the Constitution of the United States permits the expenditure of public funds by the City for the construction and preparation of the platform which served as a base for the altar used by the Pope and the clergy in the celebration of the Mass before approximately one million people assembled at Logan Circle.[1] This is not a "religious" issue but an issue of Constitutional law.

This issue was initially presented to the Court as a motion for a temporary restraining order and preliminary injunction. At a meeting in chambers attended by counsel for all the parties on September 19, 1979, the City represented that the platform was at that time 75% completed and that the Archdiocese of Philadelphia had agreed with the City that, in the event the final

---

1. Public funds were expended for labor and materials used to construct the platform and to provide shrubbery, trees and flowers surrounding the platform, together with an amplification system, carpeting and seating. Public funds were *not* expended for the Pope's chair or the altar, which were provided by the Archdiocese.

judgment was for the plaintiffs, the Archdiocese would reimburse the City for all costs incurred in the construction of the platform. It was agreed by the parties that the City should complete the construction of the platform so that there would be no disruption of the plans for the Pope's visit on October 3 and 4, 1979. It was also agreed that the Court would enter an Order, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, advancing the trial of the action on the merits and consolidating it with the hearing on the preliminary injunction motion, and that the hearing would be scheduled for October 9, 1979.

The original plaintiffs are Susan Jane B. Gilfillan and the Reverend Mary Anne Forehand, both taxpayers of the City of Philadelphia. Their standing as taxpayers under the First Amendment religion clauses is well established. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The Court granted defendants' unopposed motion to join the American Civil Liberties Union and the National Ministries, American Baptist Churches in the United States of America as parties plaintiff. On the day of trial, Reverend Walter Weider, Reverend Bryan Kopke, Bertha R. Smith, Herbert S. Herrman, Gerard H. Bye, Antoinette Montanaro, Elizabeth M. Calter, Martha Walker Miln, Paul H. Fox and Janice Schulte sought to intervene as parties plaintiff pursuant to Federal Rule of Civil Procedure 24(a). These applicants for intervention raise claims identical to those of the original plaintiffs, but, in addition, they raise claims involving equal protection under the Fourteenth Amendment and the City's alleged expenditures for the Mass celebrated by the Pope at the Civic Center on October 4. The Court finds that these applicants for intervention have not met the requirements for intervention of right pursuant to Rule 24(a), in that the original plaintiffs adequately represent applicants' interests as to the claim concerning the constitutionality of the expenditure of public funds for the platform. The evidence presented to the Court concerns only the platform expenditures. No evidence was presented on the equal protection issue nor on the issue of the City's alleged expenditures in connection with the Mass at the Civic Center on October 4. Therefore, the disposition of the issues raised by the original plaintiffs will not impair or impede the ability of these applicants to present their equal protection claims and their claims concerning the Mass at the Civic Center in a separate action. The Court will, however, grant applicants permission to intervene pursuant to Rule 24(b) as to those claims raised by the original plaintiffs, since these applicants for intervention are taxpayers of the City of Philadelphia and their claims concerning the platform are identical to the claims raised by the original plaintiffs.

Evidence was presented and the Court heard oral argument on October 9, 1979. For the reasons hereinafter set forth, the Court will enter a judgment for plaintiffs declaring to be unconstitutional under the First Amendment "establishment" clause the expenditure of taxpayer's funds for labor and materials employed in constructing, decorating, and dismantling the Logan Circle platform, and for such associated costs as carpeting, seating, sound amplification, trees, shrubbery and flowers. The City will be ordered to obtain reimbursement of such costs from the Archdiocese of Philadelphia pursuant to its agreement with the Archdiocese.

The facts of this case are largely uncontested. The parties have stipulated that on October 3, 1979 the Pope, assisted by approximately forty bishops, celebrated Mass on a platform constructed by the City of Philadelphia at Logan Circle. During the course of the Mass, Communion, a sacrament of the Roman Catholic Church, was distributed to approximately 250,000 persons. The platform upon which was placed an altar and a large cross was designed by staff architects employed by the City in the Department of Public Property. The platform completely covered the Swann Fountain in Logan Circle.[2] Its base was cylindri-

---

2. A photograph of the architect's rendering of the platform is appended to this Memorandum.

cal in shape, 28½ feet high and 144 feet in diameter. On the northwest axis of the Benjamin Franklin Parkway, the City constructed 57 steps, 60 feet wide and extending 110 feet northwest from the platform to the street level. A red carpet, owned by the City, was extended along the length of the staircase. In the center of the platform the City built a 16 step four-sided pyramidal structure, 45 feet on a side and 14 feet high. Atop this pyramid was a smaller, five-step pyramid upon which was placed the chair in which the Pope sat. The top of the pyramid was carpeted. The City painted the platform white, and surrounded it with flowers and shrubs. The City also furnished 20,000 chairs and constructed an enclosure for them. The Papal Mass was amplified by a City-owned public address system consisting of 115 loudspeakers and installed at taxpayer's expense by City workers along the Parkway. A 36 foot high Christian cross was erected on the platform; it was in place and lighted at night for six nights prior to the ceremony. The platform was used only for the open-air Mass. It remained in place for a week so that visitors could view it and was then dismantled.

In addition to the stipulation of facts, the plaintiffs presented the testimony of Robert Silver, the Commissioner of Public Property of the City of Philadelphia. He testified that the platform was designed by City architects, and, although officials of the Archdiocese approved the design, they did not participate with the architects in the actual planning. Commissioner Silver testified, however, that, from the inception of the planning process, it was understood by City officials that the platform was to be used for the celebration of a Roman Catholic Mass. He said that the City's purpose for constructing a high platform was to ensure the safety of the Pope and the crowd, as well as to make the Pope visible to the assembled gathering.

Plaintiffs also presented witnesses who testified that a ticket was required for access to the immediate area surrounding the platform.[3] The evidence presented by the plaintiff was not controverted by the defendants. It is uncontested that the only persons present on the platform during the celebration of the Mass by the Pope were Roman Catholic clergy and lay people who participated in the service. Civil officials were not present on the platform; the Governor, the Mayor and other public officials greeted the Pope upon his arrival at the airport.

Plaintiffs contend, therefore, that the platform was planned, prepared and used exclusively for a religious service, a Roman Catholic Mass celebrated by the Pope, assisted by the clergy, and that the expenditure of public funds for such a religious service is forbidden by the establishment clause of the First Amendment to the United States Constitution. On the other hand, the defendants contend that, although the platform was used for a religious service, the City had no religious purpose in constructing it. It is the City's position that the Pope is an international dignitary and head of state,[4] and, in view of the extraordinary public interest in seeing and hearing him, the City planned and constructed the platform in the interest of the Pope's security, the safety of the crowd and the maximum possible access for those who wished to see and hear the Pope. The Court does not question the sincerity of the City's expressed reasons for building the platform at Logan Circle in preparation for this extraordinary event. However, the First Amendment to the Constitution of the United States has consistently been interpreted in letter and in spirit as prohibiting the expenditure of public funds for a religious service.

The language of the First Amendment can best be interpreted in the context of the history of its inception. *See Everson v.*

---

**3.** Plaintiffs raise the issue of access to the area only insofar as it is relevant to the characterization of the event as religious or secular.

**4.** The Pope's status as head of state is not relevant to the Constitutional issue before the Court. A religious service conducted by a head of state is nonetheless a religious service.

*Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The Virginia Declaration of Rights of 1776 asserted the principle of religious freedom, although Patrick Henry and many other Virginians felt at the time that all religions should be tax-supported. Public opinion was aroused to the contrary, however, in 1785 by James Madison's "Remonstrance Against Religious Assessments". The Statute of Religious Freedom, drawn up by Thomas Jefferson and enacted by the Virginia Senate in 1786, prohibited taxation for a religious purpose. The Constitution of the United States, drafted in Philadelphia in 1787, did not include a Bill of Rights. There was considerable opposition to ratification of the Constitution, particularly in Virginia, because it did not contain a Bill of Rights. Madison, who was originally opposed to the incorporation of a Bill of Rights in the Constitution, changed his position and presented twelve proposed amendments to the Constitution to the First Congress which met in New York in 1789. Ten of these amendments, our Bill of Rights, were ratified by the States in 1791. As Mr. Justice Frankfurter commented in *McGowan v. Maryland,* 366 U.S. 420, 465, 81 S.Ct. 1101, 1153, 1156, 6 L.Ed.2d 393 (1961):

> What Virginia had long practiced, and what Madison, Jefferson and others fought to end, was the extension of civil government's support to religion in a manner which made the two in some degree interdependent, and thus threatened the freedom of each.

The First Amendment to the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ."[5] While tensions inevitably arise in the application of the "free exercise" and "establish-

ment" clauses,[6] the Framers of the Constitution regarded the interaction of the two clauses as essential to the separation of church and state. This wall of separation was determined by them to be necessary to the preservation of both religious and governmental freedom. *See Tribe* at 812–19. A violation of the principle of separation of church and state has been said to create the danger of "destroy[ing] government and degrad[ing] religion." *Engel v. Vitale,* 370 U.S. 421, 431, 82 S.Ct. 1261, 86 L.Ed.2d 601 (1962).

Indeed, the Framers recognized that the power of government to aid or "establish" religion also embodies the power to destroy or impede its "free exercise". Justice Rutledge, dissenting in *Everson, supra,* 330 U.S. at 53–54, 67 S.Ct. at 529, eloquently expressed this principle:

> The reasons underlying the Amendment's policy have not vanished with time or diminished in force. Now as when it was adopted the price of religious freedom is double. It is that the church and religion shall live both within and upon that freedom. There cannot be freedom of religion, safeguarded by the state, and intervention by the church or its agencies in the state's domain or dependency on its largesse. Madison's Remonstrance, Par. 6, 8. The great condition of religious liberty is that it be maintained free from sustenance, as also from other interferences, by the state. For when it comes to rest upon that secular foundation it vanishes with the resting. *Id.,* Par. 7, 8. Public money devoted to payment of religious costs, educational or other, brings the quest for more. It brings too the struggle of sect against sect for the larger share or for any. Here one by numbers alone will benefit

---

5. The religion clauses apply to state action through their incorporation into the Fourteenth Amendment Due Process Clause. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *see Abington School District v. Schemmp,* 374 U.S. 203, 253–58, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1962).

6. *See Tilton v. Richardson,* 403 U.S. 672, 678, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). Perhaps the best example of such tension is found in the Sunday closing law cases which presented a free exercise issue as to persons whose religions forbade work on Saturday, and an establishment issue as to the selection of Sunday as the day of rest. *See* L. Tribe, American Constitutional Law 815 (1978) [hereinafter Tribe].

most, there another. That is precisely the history of societies which have had an established religion and dissident groups. *Id.*, Par. 8, 11. It is the very thing Jefferson and Madison experienced and sought to guard against, whether in its blunt or in its more screened forms. *Ibid.* The end of such strife cannot be other than to destroy the cherished liberty. The dominating group will achieve the dominant benefit; or all will embroil the state in their dissensions. *Id.*, Par. 11. (footnotes omitted).[7]

Aside from such free exercise implications as may accompany any establishment claim, there is no free exercise of religion issue before the Court. The sole question presented is whether the challenged expenditures constitute an establishment of religion forbidden by the First Amendment.

■ The Supreme Court's first major decision construing the establishment clause was *Everson, supra*. Mr. Justice Black, writing for the majority, stated:

The "establishment of religion" clause of the First Amendment means at least this: . . . No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. . . . In the words of Jefferson, the clause against establishment of religion was intended to erect "a wall of separation between Church and State". 330 U.S. at 15–16, 67 S.Ct. at 511.

Since *Everson*, it has become evident that the "wall of separation between church and state" is sometimes difficult to define with precision. Nonetheless, in the thirty years since *Everson*, the Supreme Court has clearly defined a three-pronged test which governmental assistance must pass in order to meet the requirements of the establishment clause; (1) there must be a secular purpose,

(2) the primary effect must neither advance nor inhibit religion, and (3) it must not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *see also Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Meek v. Pittinger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Walz v. Tax Commissioner of the City of New York*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *School District of Abington Twp. v. Schemmp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Allen v. Morton*, 161 U.S.App.D.C. 239, 495 F.2d 65 (D.C. Cir. 1973). The law or act in question must fulfill all three of the above requirements in order not to violate the establishment clause.

■ The requirement of a secular purpose has rarely been, in itself, determinative of establishment clause claims. *See Tribe* at 835–36. Nonetheless, the assertion of an incidental secular purpose does not save an action which in other respects violates the establishment clause. "The Constitutional prohibition always could be brought to naught by adding a modicum of the secular." *Everson, supra*, 330 U.S. at 47, 67 S.Ct. at 527. We find that, under the facts presented in this case, the actions of the City of Philadelphia in constructing and decorating the platform amount to public sponsorship of a religious service. The secular purposes expressed by the City are incidental to this non-secular purpose. The beauty of the service, and its appeal to millions of people, Catholics and non-Catholics alike, cannot overcome the fact that the expenditure of public funds for items necessary[8] to the service crossed the "wall of separation" mandated by the Constitution.[9]

---

**7.** Madison's predictions about the competition of various religious sects for a share of public funds have been borne out in this case in that applicants for intervention, members of various religious groups, have sought to raise equal protection claims that they have not been afforded assistance equivalent to that received by the Catholic Church.

**8.** The argument that the platform was only a "foundation" for the religious accoutrements has no merit.

City architects designed the platform, the most prominent feature of which was a 36 foot high cross, the most sacred symbol of the Catholic faith. City officials knew from the time that they began to plan the structure that it would be used for the celebration of a Roman Catholic Mass. The design and structure of the platform emphasizes its religious nature. The City in effect ceded control of the Logan Circle area to the Archdiocese of Philadelphia, which had the sole responsibility for distributing tickets for admission to area in the vicinity of the platform.

■ The City contends that its purpose in constructing the platform was to protect the Pope and the assembled crowds, and to make the Pope visible to the largest possible number of people. There is no question that the platform did protect the Pope and the crowd, and it did make the Pope visible to a crowd estimated at one million. The fact remains, however, that the platform itself was not designed, constructed, or used for a civil ceremony of welcome but was designed, constructed, and used for the celebration of Holy Mass by the Pope, assisted by bishops of the Catholic Church. The platform, which was a thing of beauty, was crowned by a 36 foot cross.[10] Access to the area immediately adjacent to the platform was limited to those who had received tickets distributed by the Archdiocese. A large number of these ticketholders were direct participants in the Mass in that they received Communion distributed by the priests who moved through the crowd. On the basis of the evidence presented, this Court finds that the platform was designed, constructed, and used for a religious service and only incidentally for the secular purposes asserted by the City.

Having determined that the platform was designed, constructed and used for a religious purpose, and only incidentally for a secular purpose, it is apparent that the first part of the Supreme Court's test has not been satisfied. On this basis alone, the Court could find that the expenditure of public funds for the platform constitutes an establishment of religion in violation of the First Amendment. We shall, nevertheless, consider whether the use of public funds for the platform violates the second and third parts of the Supreme Court's three-pronged test. The second part of the test requires that the government assistance in question have a secular effect, i. e., that its primary effect must neither advance nor inhibit religion. The Supreme Court has most often dealt with the secular effect issue in the context of government aid to church-related schools.

In 1971 in the case of *Tilton v. Richardson, supra*, the Supreme Court held that a federal statute which provided grants for church-related colleges and universities was unconstitutional insofar as it left open the possibility that a building constructed with federal aid might, twenty years later, be used for religious purposes. Chief Justice Burger wrote for the plurality that the mere possibility of sectarian use of government-funded buildings imbued the initial expenditure with the "primary effect"[11] of advancing religion:

> Although we reject appellant's broad constitutional arguments we do perceive an aspect in which the statute's enforcement

---

9. "Good motives cannot save impermissible actions". *Allen v. Morton*, 161 U.S.App.D.C. 239, 246, 495 F.2d 65, 72 (D.C. Cir. 1973).

10. When the mere display of a cross was at issue, not even, as here, in the context of a religious service, courts have found establishment clause violations. *Fox v. City of Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (Cal.1978); *Lowe v. City of Eugene*, 254 Or. 518, 463 P.2d 360 (1969).

11. The Supreme Court has more recently spoken of the primary secular effect requirement in terms of a requirement that any non-secular effect be remote, indirect, and incidental. *See* Tribe at 840. For our purposes in this case, we do not find this distinction to require a different analysis.

provisions are inadequate to ensure that the impact of the federal aid will not advance religion. . . . Limiting the prohibition for religious use of the structure to 20 years obviously opens the facility to use for any purpose at the end of that period. . . . If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion. 403 U.S. at 682–683, 91 S.Ct. at 2098.

In 1973, the Court held that a statute providing for grants to nonpublic schools for the "maintenance and repair of school facilities and equipment to ensure the health, welfare and safety of enrolled pupils" was unconstitutional because a religious school *might* use the funds to pay for heating and lighting the school chapel or classrooms in which religion was taught. *Committee for Public Education and Religious Liberty v. Nyquist, supra.* Although the Court found that the statute passed the first part of the three-pronged test, the Court held that it had a "primary effect that advances religion in that it subsidizes directly the religious activities of sectarian elementary and secondary schools." *Id.,* 413 U.S. at 774, 93 S.Ct. at 2966.

Other Supreme Court decisions demonstrate even more clearly that the establishment clause prohibits assistance which results in even remote and indirect aid to religion: *Lemon v. Kurtzman, supra* (reimbursement to nonpublic schools for the cost of teaching mathematics, modern foreign languages, and the physical sciences); *Abington v. Schemmp, supra* (the reading of ten verses of the Bible and the saying of the Lord's Prayer in the public schools); *Engel v. Vitale, supra* (in-class recitation of "non-denominational" prayer prepared by the New York Board of Regents); *Tudor v. Board of Education,* 14 N.J. 31, 100 A.2d 857 (1953), *cert. denied,* 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 644 (1954) (free distribution of the Gideon Bible in public schools);

*McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (*re*leased time program in which regular classes ended one hour early one day each week so that religious instruction might be given in the public classrooms).

An analysis of the above decisions of the Supreme Court leaves this Court no alternative but to conclude that the use of public funds under the circumstances heretofore described had the primary effect of advancing religion and thus violated the establishment clause.

Finally, we will consider the third part of the Supreme Court's three-pronged test: whether the assistance fosters an excessive entanglement of government with religion. In other words, did the City's construction of the platform upon which the Pope said Mass result in an impermissible entanglement of government and religion? The Supreme Court has discussed the concept of "entanglement" in several contexts. *See generally, Tribe* at 865–880. In one sense, an impermissible entanglement might be the necessity of constant monitoring by the state of the administrative activities of a religious enterprise. *See Lemon v. Kurtzman, supra.* That type of entanglement is not present in the instant case.

A second type of entanglement is the participation of governmental officials with church officials in the planning for a religious function, such as was found unconstitutional in *Allen v. Morton,* 161 U.S.App. D.C. 239, 495 F.2d 64 (D.C. Cir. 1973). There, the Christmas Pageant of Peace in Washington, D.C., particularly the inclusion in the Pageant of a life-sized creche, was found unconstitutional because federal officials participated in the planning and organizing committees, although there was no federal financial subsidy. Judge Tamm, in his concurring opinion, stated that the entanglement test requires "that Government involvement with religion should be kept to a necessary minimum, and that there should be avoided not only the actual interference but also the potential for and appearance of

interference with religion." *Id.* 161 U.S. App.D.C. at 250, 495 F.2d at 75. In line with this reasoning, it would appear that the planning for the platform by City officials with the concurrence of Archdiocese officials constitutes an impermissible entanglement. Even if the City believed that, in providing the platform, it was promoting a secular purpose, what it actually did, in the words of Justice Brennan, was "employ the organs of government for essentially religious purposes." *Abington v. Schemmp, supra*, 374 U.S. at 231, 83 S.Ct. at 1576.

Finally, a factor which the Supreme Court has considered within the purview of the entanglement test is the tendency of the assistance in question to promote divisiveness among and between religious groups. This was recognized in *Everson. See* pp. 1164–1166, *supra.* The Court discussed the divisiveness issue at length in *Lemon v. Kurtzman, supra*, 403 U.S. at 622, 91 S.Ct. at 2116:

> A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs. . . . Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith. Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect.

The danger that various denominations and sects would press demands for equal treat-

ment was one of the grounds upon which ceremonial Bible reading in the public schools was held unconstitutional in *Abington v. Schemmp, supra*, 374 U.S. at 241–42, 83 S.Ct. 1560. Such demands have already occurred in this case. *See* n. 7, *supra.*

Thus, we find that the City's expenditure of public funds for the construction and decoration of the platform upon which the Pope said Mass constitutes a violation of the establishment clause in that the actions of the City have failed all three tests—secular purpose, secular effect, and entanglement.

■ We now must determine the amount of public funds expended in connection with the platform. The parties are in general agreement as to most of the cost figures. The City requests that the Court consider the net cost, deducting the cost of those items which can be reused by the City. While we do not suggest that First Amendment violations can be absolved by reimbursing the government for unconstitutional expenditures, we do find that, under the circumstances in this case, reimbursement of the City for the net cost is an appropriate remedy. The construction of the platform proceeded to completion by agreement of the parties. There is now no doubt that, had the Court proceeded with this case prior to the Pope's visit, the City would have been enjoined from completing the platform. We find that the net total of $204,-569 is the amount which was unconstitutionally expended by the City, as detailed in the chart appended to this Memorandum. The City will be ordered to obtain reimbursement of this sum from the Archdiocese of Philadelphia pursuant to its agreement with the Archdiocese.

This Memorandum is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## APPENDIX

<u>ARCHITECT'S RENDERING OF THE PLATFORM</u>

<u>APPENDIX – COSTS</u>

<u>EXPENDITURES</u>

| | | |
|---|---|---|
| Lumber ................... | $ 28,894 | (Deposition of Robert Silver—ex. 2) |
| Bunting ................... | 2,618 | "       " |
| Paint .................... | 2,785 | "       " |
| Nails .................... | 300 | "       " |
| Staging & Scaffolding ....... | 40,000 | |
| Chair Rental .............. | 12,000 | (Deposition of Robert Silver—ex. 6) |
| Carpet ................... | 5,800 | (Deposition of Robert Silver—p. 16) |
| Shrubs & Flowers .......... | 48,860 | (Deposition of Robert Silver—ex. 1) |
| Sound Equipment .......... | 55,950 | (Deposition of Robert Silver—ex. 5, p. 7) |
| Park Commission .......... | | (Deposition of Robert McConnell—ex. 1) |
| Labor ............... | 31,276 | |
| Public Property Department .. | | (Deposition of Robert Silver—ex. 1, 7, 8, 9) |
| Labor ............... | 67,114 | |
| Architects & Engineers ..... | | (Deposition of Robert Silver—ex. 4) |
| Labor ............... | 7,200 | |

APPENDIX – COSTS

EXPENDITURES
Labor—Dismantling . . . . . . . . .   7,944     (Deposition of Robert Silver—p. 30; Deposition of Robert McConnell—pp. 6–7)

TOTAL . . . . . . . . . . . . . . . $310,741

VALUE OF REUSABLE ITEMS *

| Lumber . . . . . . . . . . . . . . . . . . . | $ 28,894 |
| Bunting . . . . . . . . . . . . . . . . . . . | 2,618 |
| Sound Equipment . . . . . . . . . . . | 20,000 |
| Shrubs & Flowers . . . . . . . . . . . | 48,860 |
| Carpet . . . . . . . . . . . . . . . . . . . | 5,800 |

TOTAL . . . . . . . . . . . . . . . $106,172

$310,741
106,172

NET COST . . . . . . . . . . . . $204,569

* The Court has accepted the representations of City officials as to the value of reusable items with the exception of $5,950 for labor which was included in the sound equipment figure. See Deposition of Robert Silver, ex. 5, p. 7.