637 F.2d 924
 GILFILLAN, Susan Jane B., Rev. Forehand, Mary Anne
and
Rev. Weider, Walter, Rev. Kopke, Bryan, Smith, Bertha R.,
Herrman, Herbert S., Bye, Gerard H., Montanaro, Antoinette,
Calter, Elizabeth M., Miln, Martha Walker, Fox, Paul H.,
Schulte, Janice, Intervenors in District Court,
v.
CITY OF PHILADELPHIA, Mayor Rizzo, Frank L., Managing
Director Levinson, Hillel S., City Representative La Sala,
Joseph A., Commissioner of Public Property Silver, Robert,
City of Philadelphia, Appellants.
 No. 79-2786.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 15, 1980.
Decided Dec. 30, 1980.
 
 Alan J. Davis, City Sol., T. Michael Mather (argued), Chairman, Litigation Dept., Philadelphia, Pa., for appellant City of Philadelphia.
 Henry W. Sawyer, III (argued), Edward M. Posner, Drinker, Biddle & Reath, Philadelphia, Pa., for appellees Susan Jane B. Gilfillan and American Civil Liberties Union, Greater Philadelphia Branch.
 Earl W. Trent, Jr., Valley Forge, Pa., for appellees Rev. Mary Anne Forehand and National Ministries, American Baptist Churches in the U.S.A.
 John T. Acton, Willow Grove, Pa., Lee Boothby (argued), Berrien Springs, Mich., for intervenors.
 Before ALDISERT, ROSENN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 On October 3, 1979, more than a million people came together at Philadelphia, Pennsylvania to hear Pope John Paul II offer Mass and deliver a sermon at the City's Logan Circle. The liturgical service, the largest event during the Pope's two-day visit to Philadelphia, generated an unprecedented outpouring of warmth and good will felt throughout the City for months following. No one disputes that the historic visit of the Pope had a lasting and beneficial effect on the people of Philadelphia. It also favorably enhanced the image of the City. This case, however, requires us to decide a narrow question of the constitutionality of the expenditure by the City of Philadelphia of more than $200,000 to construct a special platform and to provide other extraordinary assistance for the papal ceremonies at Logan Circle. Without reflecting in any way on the brilliant success of the Pope's visit to Philadelphia, what we must examine in this case is whether certain governmental actions by the City were permissible under the Establishment Clause of the first amendment of the Constitution.
 
 I.
 
 2
 In September of 1979, Pope John Paul II, the temporal leader of the Roman Catholic Church, announced that he would undertake a "pastoral mission" to the United States and that his trip would include a stop in Philadelphia. City officials then began a series of meetings with the leaders of the Archdiocese of Philadelphia in preparation for the Pope's visit. Out of these meetings grew plans for a Mass at Logan Circle. In accordance with those plans, and with the approval of the Archdiocese, the City designed and built, over Swann Fountain in Logan Circle, a large platform to be used as the dais from which the Pope would celebrate Mass and distribute Holy Eucharist, a sacrament of the Roman Catholic Church, and bring his message to Philadelphia.
 
 
 3
 This challenge came shortly after the City announced its construction plans. Plaintiffs Susan Jane B. Gilfillan and Reverend Mary Anne Forehand, taxpayers of the City of Philadelphia, brought suit to enjoin the City from expending funds to build the platform for the Pope, alleging a violation of the first amendment's Establishment Clause.[1] With the approval of the district court, the parties stipulated to an order under which construction was allowed to proceed, but the Archdiocese agreed to reimburse the City for the cost of the platform and related construction should there be a final judgment that the City could not constitutionally pay for the items.
 
 
 4
 The finished platform was an impressive creation that significantly helped beautify the Mass offered by the Pope. Paid for entirely by the City, the platform was cylindrical in shape, 28 1/2 feet high and 144 feet in diameter. Fifty-seven steps, 60 feet wide, extended 110 feet from the platform to the street. On the platform was a 16-step, four-sided pyramid, 45 feet on a side and 14 feet high. On this pyramid was another small, 5-step pyramid upon which was placed a throne used by the Pope. The platform was painted white; the top of the large pyramid and portions of the steps were carpeted in red. In one corner of the large pyramid stood a white, 36-foot high cross. See photograph reproduced at 480 F.Supp. 1161, 1170 (E.D.Pa.1979). The City encircled the platform with nearly $50,000 worth of shrubbery and yellow chrysanthemums. The City also rented 20,000 chairs for seating of selected guests; it supplied a sound system, part rented and part purchased at a cost of more than $50,000; and it constructed a nearby, separate platform for a 360-voice choir.
 
 
 5
 On the afternoon of October 3, 1979, Pope John Paul II led a procession from the Cathedral of Saints Peter and Paul to the Logan Circle platform. There he began a service that lasted more than two hours, during which he delivered a homily and personally distributed Communion to 150 worshipers. With him on the platform were a large number of clergy, but no city officials. The 20,000 seats nearest the platform, the chairs rented by the City, were available only to ticket holders, and tickets could be obtained only through the Archdiocese. The platform, illuminated for six days prior to the service, was left in place over Swann Fountain for more than one week after the service, but it was used for no other purpose.
 
 
 6
 After the Pope's visit had ended, the City and those contesting the City's expenditures presented their arguments before Judge Raymond Broderick of the United States District Court for the Eastern District of Pennsylvania. The plaintiffs opposed only a few items. Not challenged was the City's construction of a platform at the airport, a platform used by city as well as religious officials in welcoming the Pope to Philadelphia. Not challenged was the City's deployment of police along the parade route and at all events attended by the Pope. Not challenged was the Pope's use of public areas such as Logan Circle for his religious activities. Rather, plaintiffs contested only the City's payment for the construction of the platform in Logan Circle, a platform used exclusively for a religious service, and a few other extraordinary expenditures, all a kind never offered to other organizations, religious or non-religious. Specifically, these additional expenditures were for renting of the chairs and a sound system, the planting of shrubbery and flowers, and the building of the smaller platform for the choir. The plaintiffs argued that such assistance cannot be offered without violating the Establishment Clause of the first amendment of the Constitution.
 
 
 7
 On November 9, 1979, Judge Broderick, in a scholarly and well reasoned opinion, held that the expenditures were unconstitutional and ordered the reimbursement. 480 F.Supp. 1161 (E.D.Pa.1979). The amount to be reimbursed totalled $204,569 and included the cost of materials and labor, less the value of reusable items. See id. at 1170-71.[2] The City appealed.[3] We affirm.
 
 II.
 
 8
 The first amendment of the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." The amendment was made binding on the states by the fourteenth amendment. Everson v. Board of Education, 330 U.S. 1, 8, 67 S.Ct. 504, 507, 91 L.Ed. 711 (1947). The two religion clauses have stirred deep feelings and their meaning has been much litigated. Although members of the Supreme Court have disagreed on the proper application of the Establishment Clause, see Committee for Public Education v. Regan, 444 U.S. 646, 648, 662, 671, 100 S.Ct. 840, 844, 855, 63 L.Ed.2d 94 (1980); Everson, supra, 330 U.S. at 3, 18, 28, 67 S.Ct. at 505, 512, 517, a fairly simple statement of the test has evolved: "(A) legislative enactment does not contravene the Establishment Clause if it has a secular legislative purpose, if its principal or primary effect neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion." Committee for Public Education v. Regan, 444 U.S. 646, 653, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980), citing Roemer v. Maryland Public Works Board, 426 U.S. 736, 748, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976); Committee for Public Education v. Nyquist, 413 U.S. 756, 772-73, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973); Lemon v. Kurtzman, 403 U.S. 602, 612-613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). This circuit is familiar with the application of this three-part test. See Public Funds for Public Schools v. Byrne, 590 F.2d 514 (3d Cir.), aff'd., 442 U.S. 907, 99 S.Ct. 2818, 61 L.Ed.2d 273 (1979).
 
 
 9
 In its analysis of the constitutionality of the City's funding of the construction of the platform and the other extraordinary support for the Logan Circle ceremony, the district court employed the three-part test. 480 F.Supp. at 1166. The City does not contend that some other test should be applied in an examination of the City's actions, but does argue that the district court erroneously applied the test.
 
 
 10
 Applying the test, the district court found that the challenged expenditures failed to satisfy any of the three requirements of the Establishment Clause. The court concluded that the City's action (1) had primarily a religious purpose and only incidentally a secular purpose; (2) had a primary effect that advanced religion; and (3) created two types of impermissible entanglement: (i) the joint participation in the planning of and preparation for a religious function, and (ii) the promotion of divisiveness among and between religious groups. 480 F.Supp. at 1168-69. We shall now review that application of the law.
 
 A. Secular Purpose
 
 11
 The district court found that the construction of the platform had only an incidental secular purpose, and that the primary purpose of the City's action was religious. 480 F.Supp. at 1167. That a government action has a religious purpose does not mean that it cannot also have a secular purpose sufficient to satisfy this element of the test. For instance, Sunday closing laws have been found to have had a secular purpose in the goal of a uniform day of rest. McGowan v. Maryland, 366 U.S. 420, 445, 81 S.Ct. 1101, 1115, 6 L.Ed.2d 393 (1961). But not all state actions have passed the test. In Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Court found no non-religious justification for a statute prohibiting the teaching of evolution.
 
 
 12
 The City of Philadelphia asserts two secular purposes: the first, the protection of the Pope and the crowd, and the second, the possibility of a "public relations bonanza," a purpose first raised on appeal and not apparently considered by the district court. The asserted purpose of protecting the Pope is, at best, suspect. At all other events attended by the Pope, he was protected by, at most, police and barricades. At Logan Circle, the platform was surrounded by barricades and police officers and these, much more than the platform, protected the Pope. Approaching and leaving the ceremony, the Pope passed through the crowd, and at one point during the service he went into the crowd. The City argues that by providing the platform to make the Pope widely visible it prevented a rush of persons attempting to see the Pope. This claim of protection is only partially true because the Pope's position on the platform made him a clear target in any direction. In any event, the district court found that the platform was not designed, constructed or used for a civil purpose but for the celebration of Holy Mass by the Pope, assisted by the bishops of the Catholic Church. 480 F.Supp. at 1167. This finding is not plainly erroneous.
 
 
 13
 Nor can we accept the City's claim of protecting the Pope as a purpose sufficient to justify several of the other contested preparations: the 36-foot high cross; approximately $50,000 in flowers and shrubbery; the $55,950 sound system; and the stand for the choir. Unless some other rational secular purpose is advanced for these expenditures, they, like the statute in Epperson, supra, must be found unconstitutional. At least some minimal secular purpose must be advanced.
 
 
 14
 On appeal, the City asserts a public relations purpose, claiming that by funding these extraordinary items, it helped put Philadelphia in a good light. By so arguing, the City places itself in a difficult position. Viewers of the ceremony that do not know of the city-sponsorship are likely to believe only that the Archdiocese, not the City, made a special effort. The Archdiocese, not the City, will receive the public relations "bonanza." But if the city-sponsorship is known, that aid connotes the state approval of a particular religion, one of the specific evils the Establishment Clause was designed to prevent. An auspicious aspect of our pluralistic society is its rich religious diversity. The essential purpose of the Establishment Clause reflects this pluralism. Finally, if some peripheral public relations benefit can constitute a sufficient secular purpose, then the purpose test is destroyed, for it is hard to imagine a city expenditure that will not look good in someone's eyes.[4]
 
 
 15
 We recognize that it is difficult for a court to ascertain the true purpose behind a governmental action, particularly when the challenged activity is not legislation. See Allen v. Morton, 495 F.2d 65, 68 (D.C.Cir.1973). However, we believe that if we are to retain any meaningful purpose test, we must conclude that the district court did not err in finding that the challenged actions of the City were undertaken with a religious purpose. Because the City failed to satisfy the first part of the constitutional test, the district court properly held that the City expenditures violated the Establishment Clause of the first amendment.
 
 B. Religious Effect
 
 16
 In Abington School District v. Schempp, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963), the Supreme Court stated that government aid should have "a primary effect that neither advances nor inhibits religion." Similarly, in Committee for Public Education v. Nyquist, 413 U.S. 756, 783-85 n.39, 93 S.Ct. 2955, 2970, 2971 n.39, 37 L.Ed.2d 948 (1973), the Court iterated that aid is impermissible if it has "the direct and immediate effect of advancing religion."[5] The state must maintain an attitude of absolute neutrality, neither "advancing" nor "inhibiting" religion. Id. at 788, 93 S.Ct. at 2973. The district court found that the City's action had a primary religious effect under both of the above tests. 480 F.Supp. at 1167-68.
 
 
 17
 The City presents several imaginative arguments against this finding. First, it asserts that the "unique" nature of the Pope's visit somehow makes the effect not primarily religious, because "there is little risk that the expenditures will have the effect of placing the City's imprimatur of approval on the Catholic religion." We see no merit to that disclaimer. City officials went out of their way to align themselves and collaborate with the Archdiocese. For weeks, representatives of the City and the Archdiocese repeatedly met to discuss the numerous problems involved in designing and constructing the platform, including the cross, and planning for the Mass.[6] These meetings were separate and independent of the planning for police and fire functions, emergencies and crowd control. In addition, the district court found that the City had in effect "ceded control of the Logan Circle area to the Archdiocese," 480 F.Supp. at 1167, as evidenced by the Archdiocese's sole responsibility for the distribution of tickets for admission to the area in the vicinity of the platform. Further, regardless of imprimatur, the City's assistance had effectively enabled the Pope to reach large numbers of persons and to perform a religious service. A religious effect of such magnitude may itself be unique.
 
 
 18
 The City maintains that the "transitory nature" of the aid the Pope used the platform once and it was removed within two weeks means that no religious institution was aided. But the aid need not be continuing to have an impermissible religious effect. The service was viewed directly by more than a million persons. It cannot be argued that its effect was not great. The platform itself was, on the City's orders, left standing for more than a week to enable Philadelphians to visit it. The City thus created a temporary shrine. Such activity is not compatible with the Constitution.
 
 
 19
 Nor can it be argued that any religious effect was too remote. In Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Court sustained most of the federal Higher Education Facilities Act of 1963 providing aid to all colleges for construction of buildings. The Act permitted the Government to recover the aid if the federally financed facility were used for sectarian instruction or as a place of worship. However, under the Act, recovery was possible only if the breach occurred within 20 years after completion of construction. The Court found the possibility that a federally financed building might be used for some religious activity more than 20 years later was a sufficient religious effect to render that aspect of the Act, the 20-year limitation, invalid. Id. at 683-84, 91 S.Ct. at 2098. The religious effect there was more attenuated than what we have here.
 
 
 20
 The City also reasons that any religious effect was the result of the Mass and not the City's providing the platform and related support. If this were true, then the clause struck down in Tilton, supra, would have been valid because, by the same argument, the religious instruction and not the building is the root of the religious effect. This claimed distinction between sources of effects would, if accepted, emasculate the Establishment Clause.
 
 
 21
 The religious effect was both plain and primary. The Pope, admittedly on a pastoral mission to this country, was, with the aid of a magnificent setting provided by the City, able to celebrate a Mass and deliver a sermon. In so doing, he brought a religious message, with the help of the City, from the Roman Catholic Church to millions of persons. This is an effect that can only be considered as advancing religion. We therefore affirm the district court's holding that the City's action created an impermissible establishment of religion.
 
 C. Entanglement
 
 22
 The district court found the relationship between the City and the Archdiocese constituted entanglement in violation of the third part of the Establishment Clause test. 480 F.Supp. at 1168-69. The problem the district court found was not the necessity of constant government monitoring of sectarian activities fatal in other cases, but rather was the (1) joint planning with the Archdiocese of the Logan Circle ceremony and (2) the potential for community divisiveness along religious lines that joint planning created. The City disputes each conclusion on the basis that any state-church relationship was not a continuing one.
 
 
 23
 In Allen v. Morton, 495 F.2d 65 (D.C.Cir.1973), the District of Columbia Court of Appeals found excessive entanglement between the federal Government and the committee running the Christmas pageant. The City attempts to distinguish this case on two grounds: first, the Government in Allen had an active role in management of the pageant, with officials holding two of the five positions on the executive committee; and second, the Government "co-sponsored" the pageant, providing labor assistance.
 
 
 24
 On review, the facts in Allen, supra, seem quite similar to those involving the relationship between the City here and the Archdiocese. Despite the City's claim, the only contact between the two was not "to discuss provision of normal government services." Philadelphia Commissioner LaSala, in his deposition, indicated that for each aspect of the preparations, the Philadelphia official in charge had a counterpart in the Archdiocese. Admittedly, the City alone designed the platform, but the design was approved by the Archdiocese before it was built. Finally, the Archdiocese alone handled the access to the 20,000 reserved seats. Admission was by ticket only, tickets available only through the Archdiocese. At the service, Archdiocese "marshals" turned away non-ticket holders from the several square block area where the 20,000 seats were located. Thus, in preparation, joint efforts were the norm, and at the event the religious organization apparently took over some government functions. We therefore affirm the district court's finding of entanglement based on the facts of the preparation.
 
 
 25
 An alternative basis for the district court's conclusion that the City's activity caused entanglement was a finding that the assistance tended to promote divisiveness among and between religious groups. This basis was recognized in Lemon v. Kurtzman, 403 U.S. 602, 622-24, 91 S.Ct. 2105, 2115, 2116, 29 L.Ed.2d 745 (1971). Again, the City argues that the ephemeral nature of the Pope's visit makes this finding incorrect, reasoning that any divisiveness will be evanescent. True, in Lemon, statutes providing long-term aid to parochial schools were challenged, but there is no reason to believe that short-term aid of the type rendered here is not as divisive. Judge Broderick's finding of divisiveness was based on the number of plaintiffs. At least three separate groups brought suit to enjoin the City's assistance. We believe the district court could find entanglement from the divisiveness evidenced by the number of legal actions.
 
 
 26
 Thus, the City's assistance and the extensive cooperation during the preparations for the Pope's visit, also fail the entanglement test, because of the potential for divisiveness.
 
 III.
 
 27
 Throughout this appeal, the City has argued that to find that the City's aid displays an impermissible purpose, effect, or entanglement, would constitute a denial to members of the Archdiocese of their rights to free exercise of their religion as protected by the first amendment. For instance, after arguing that any religious effects stem from the Mass, not the City's aid, the City contends that the plaintiffs are really trying to limit the Pope's religious activities, and therefore are attempting to deny his free exercise of religion. Such an argument has only superficial appeal. The free exercise cases, by their nature, arise when the state has denied the right. For example, in Sherbert v. Verner, 374 U.S. 398, 10 L.Ed.2d 965 (1963), the Court found South Carolina abridged a woman's right to the free exercise of her religion when the state would not give her unemployment compensation because she refused to work on Saturday, her Sabbath.
 
 
 28
 The issue in this case is city spending on the platform, shrubberies and related assistance, such as rental of chairs and a sound system, not whether the Pope could use city land at Logan Circle for religious purposes or have police protection. The question then is whether the Archdiocese would have a colorable claim against the City for reimbursement if the City had declined the challenged assistance. Such a claim would obviously be without merit. To have the City reimbursed for such expenditures then cannot be a denial of the right of free exercise of religion.
 
 
 29
 O'Hair v. Andrus, 613 F.2d 931 (D.C. Cir.1979), which the City cites repeatedly as supporting their free exercise argument, does not in any way suggest a different conclusion. That case also involved Pope John Paul II's visit to the United States. The Pope held a service on the National Mall at Washington, D. C. The challenge there was primarily directed to this use of the property, a use the court sustained. The City provided police, fences and barriers, and utilities, but these had been regularly provided to every major demonstration raising first amendment values, such as the inhabitants of "Resurrection City," the anti-war protestors at the Moratorium, and recently the farmers who brought their tractors and protests to Washington. The court noted specifically that the Washington Archdiocese would expend in excess of $400,000 for construction of the platform and the alter, other physical and electrical facilities, sound equipment, chairs and clean-up, the very items the City of Philadelphia paid for. In this case, the plaintiffs agree the Pope had a right to use the city property. Their objection is to the extraordinary city expenses, an issue not raised in O'Hair.
 
 
 30
 Nor does Chess v. Widmar, 635 F.2d 1310 (8th Cir. 1980), help the City. The Eighth Circuit, in deciding that a public university cannot prohibit a recognized student group from using any university facilities to hold religious services was certainly not holding that the university had a duty to erect a special facility for that group. Chess v. Widmar would be relevant had the City sought to deny the Pope the use of Logan Circle. Chess and the other free exercise cases require only neutrality. They in no way substantiate the City's argument that it had a duty to support the Archdiocese by providing extraordinary assistance to the Pope's religious activities.
 
 
 31
 We conclude therefore that the district court correctly rejected the City's free exercise argument.
 
 IV.
 
 32
 The development of the religion clauses of the first amendment began before the First Congress in the struggles in the various states over religious freedom. See generally Everson v. Board of Education, 330 U.S. 1, 8-14, 67 S.Ct. 504, 507-510, 91 L.Ed. 711 (Black, J.), 31-49, 67 S.Ct. 519-527 (Rutledge, J., dissenting) (1947). In Virginia in 1785, James Madison wrote and circulated his famous "Memorial and Remonstrance" to the General Assembly of the Commonwealth of Virginia. See id. at 63, 67 S.Ct. at 534. Although Madison's views may not have been shared by a majority of the drafters of the Constitution, Public Funds for Public Schools v. Byrne, 590 F.2d 514, 522 (3d Cir.) (Weis, J., concurring), aff'd, 442 U.S. 907, 99 S.Ct. 2818, 61 L.Ed.2d 273 (1979), his statements remain instructive when Establishment and Free Exercise Clause issues are raised. Urging the Virginia assembly to defeat a bill that would provide financial support from tax revenues to the clergy of a certain sect, Madison observed that "the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment." Madison, Memorial and Remonstrance P 3, quoted at Everson, supra, 330 U.S. at 65-66, 67 S.Ct. at 535-536. By requiring that the Archdiocese, pursuant to the order to which it stipulated in September 1979, reimburse the City for the impermissible expenditures, we in no way penalize the Archdiocese. Rather, we are adhering to the venerable principle of neutrality. For if the City can spend in excess of $200,000 directly in support of the Pope's Mass, it can devote half its budget to some other group next year. As Madison did not accept the "arrogant pretension" that "the Civil Magistrate is a competent Judge of Religious truth," id. at P 5, 330 U.S. at 67, 67 S.Ct. at 536, we cannot accept the City's decision to support a particular sect. Finally, because we believe, as Madison argued, that such support "will destroy the moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced amongst its several sects," id. at P 11, 330 U.S. at 69, 67 S.Ct. at 537, we must affirm the district court and order the Archdiocese to reimburse the City of Philadelphia for those expenditures made by the City in violation of the Establishment Clause of the first amendment of the Constitution.
 
 
 33
 For the foregoing reasons, we hold that the challenged City expenditures violate the Establishment Clause of the first amendment of the Constitution. The Archdiocese of Philadelphia is required, in accordance with the stipulation and order of the district court, to reimburse the City $204,569 that the City unconstitutionally spent in support of Pope John Paul II's Mass at Logan Circle.
 
 
 34
 The judgment of the district court will be affirmed.
 
 
 35
 ALDISERT, Circuit Judge, dissenting.
 
 
 36
 Susan B. Gilfillan and the American Civil Liberties Union request a judicial declaration that the expenditure of a certain portion of City of Philadelphia funds relating to a two-day visit by Pope John Paul II in October, 1979, was improper under the establishment clause of the first amendment.[1] The City spent approximately $1,200,000 during the papal visit. This lawsuit is a challenge only to those funds expended by the City to erect a platform and buy public address equipment in connection with the celebration of a mass at Logan Circle. The district court agreed with the plaintiffs that the City's expenditure of $204,569 of the total expenditure violated the Constitution. The majority have affirmed. I would reverse and remand these proceedings to the district court with a direction to enter judgment in favor of Philadelphia. In my view, there was a secular purpose for the challenged expenditures, the primary effect was secular, and the narrow relief requested by the appellees and granted by the district court requires the City of Philadelphia impermissibly to entangle itself in religion. This entanglement violates the establishment clause of the first amendment.
 
 I.
 
 37
 This controversy arose from the visit to Philadelphia of Pope John Paul II, head of the Vatican State and spiritual leader of the world's Roman Catholics, as part of a six-city visit to the United States. Pennsylvania's governor, Philadelphia's mayor, and other civil and religious dignitaries greeted him at the airport and the usual welcoming ceremony followed. A motorcade then proceeded through the City to the Catholic basilica at Logan Circle, a public park. Thereafter, the Pope emerged from the basilica leading a religious procession to the public park, mounted a platform, and celebrated a nationally-televised pontifical mass.
 
 
 38
 The plaintiffs' position before the district court was clear and precise. They contested neither the celebration of mass on public property nor the normal expenditure of public funds for security and crowd control. They assert the same position before this court. Although the City expended approximately $1,200,000 for the papal visit, they challenge only the $204,569 expended for the platform and its appurtenances.[2] Thus, the question presented by this appeal is whether the United States Constitution precludes a municipality from paying these particular expenses incident to the visit of Pope John Paul II.
 
 II.
 
 39
 Had the platform been constructed for a priest, bishop or cardinal visiting the City and celebrating mass I would have no difficulty agreeing that the expenditure violated the establishment clause. But Pope John Paul II is no ordinary bishop; he is the head of a secular state, albeit a theocratic one. The Holy See is an independent papal state, located in Vatican City, emerging from the Lateran Pacts entered into by Pope Pius XI and the Kingdom of Italy in 1929. These pacts provided that, in return for recognition of the secular Italian government by the Holy See, the Pope would be provided with a small, independent political enclave, a large sum of money as compensation, and recognition of the Roman Catholic faith as the state religion of Italy. These pacts have remained essentially unaltered since their ratification.
 
 
 40
 Sovereignty in this independent papal state is exercised by the Pope upon his election as the head of the Catholic Church. He has absolute executive, legislative, and judicial powers within the city. Administrative powers are delegated to a governor who is also permitted to compile legislation. The governor is in turn assisted by a central council. The principle sources of objective law in the Holy See are the Codex juris canonici and the apostolic constitutions, although the penal code of Italy applies within its boundaries.
 
 
 41
 The Holy See has civil courts in addition to its religious courts, although most civil offenses are tried in Italy. There is a diplomatic corps of approximately sixty persons who serve as legates (ambassadors). In addition, apostolic delegates serve in nations without formal diplomatic relations with the Vatican, including one to the United States.
 
 
 42
 The papal state has its own telephone and telegraph system, post office, railroad station, radio station, banking system, stamps, currency, pharmacy, jail, and flag. Vatican "papers" are given to citizens, who consist primarily of permanent Vatican employees. The state is in all ways independent of Italy, although the Italian government does provide certain services, including police to aid in security and crowd control.[3]
 
 
 43
 As a theocratic state, the Holy See is not unique. Israel, for example, is its Jewish counterpart. The religious nature of the State of Israel is disclosed by the circumstances surrounding its establishment on May 14, 1948. Its creation fulfilled the historic dream of the Jewish people that stemmed from their belief in God's promise that the land of Israel would one day be theirs. Excerpts from the "Declaration of the Establishment of the State of Israel" emphasize the religious significance of the date:
 
 
 44
 Eretz-Israel was the birthplace of the Jewish people. Here their spiritual, religious, and political identity was shaped. Here they first attained to statehood ... and gave to the world the eternal Book of Books.
 
 
 45
 In (1897) ... the First Zionist Congress convened and proclaimed the right of the Jewish people to national rebirth in its own country.
 
 
 46
 The right was ... re-affirmed in the Mandate of the League of Nations which ... gave international sanction to the historic connection between the Jewish people and Eretz-Israel and to the right of the Jewish people to rebuild its National Home.
 
 
 47
 Accordingly, we ... representatives of the Jewish community of Eretz-Israel and of the Zionist movement ... hereby declare the establishment of ... the State of Israel.
 
 
 48
 We appeal to the Jewish people throughout the Diaspora to rally round the Jews of Eretz-Israel ... and to stand by them in the great struggle for the realization of the age-old dream the redemption of Israel.[4]
 
 
 49
 The Law of Return, for example, announces the right of every Jew to settle in Israel. The World Zionist Organization Jewish Agency (Status) Law regulates the relationship of the World Zionist Organization in Israel to the state. Other laws relating to religion govern such matters as kosher food for soldiers, religious service budgets, and the Chief Rabbinate Council. Whenever new legislation is needed, the relevant principles of Jewish law are examined first. If they are found to be suitable, they are incorporated into the law.[5]
 
 
 50
 So close is the relationship between members of the Jewish faith and Israel that Israeli Prime Minister Menachem Begin, arguing that criticism of Israel by the French government provoked acts of anti-semitism in France, recently stated: "The incitement against the Jewish state is, objectively speaking, incitement against the Jewish people."[6]
 
 
 51
 Another theocratic state is the newly-created Islamic Republic of Iran. Principle 4 of its constitution states:
 
 
 52
 All civil, penal, financial, economic, administrative, cultural, military, political, etc., laws and regulations should be based on Islamic rules and standards. This principle will absolutely or in general be dominant over all of the principles of the constitution, and other laws and regulations as well, and any determination in this connection will be made by the religious jurists of the Council of Guardians.
 
 
 53
 Principle 5 states that the "religious leader and Imam" of Iran is a substitute for the missing Shiite guide, the twelfth Imam who disappeared eleven centuries ago and is expected to return.[7]
 
 
 54
 These examples illustrate the difficulties inherent in the majority's implicit distinction between heads of secular states and heads of religious states. Under the majority's analysis, the extension of diplomatic courtesies and security to Pope John Paul II must be carefully segmented into numerous contexts. More important, however, is the failure of the majority to recognize that although the Pope's following is largely, but not totally, a result of his religious status, the size of that following raises security and safety concerns for the City of Philadelphia that cannot be neatly characterized as "religious."
 
 III.
 
 55
 This case is unique because it requires examination of a one-time expenditure of municipal funds incident to the visit of a foreign dignitary who also heads a religion. The plaintiff-appellees rely on a novel and elusive distinction between municipal expenditures for a reception platform at the Philadelphia airport, from which Pope John Paul II extended a blessing to all observers, and expenditures for a platform at Logan Circle, from which he conducted mass and distributed the Holy Eucharist. Although there is no controlling precedent for these unique facts, some direction is forthcoming in the standards developed by the Supreme Court for analysis of expenditures in aid of religious schools. The Court announced these standards in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971):
 
 
 56
 Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' Walz (v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)).
 
 
 57
 My difference with the majority is in the emphasis I place on the City's concern with safety and security and with its reputation in the eyes of the world. Although the majority are correct that the expenditures at issue aided the Catholic Church,
 
 
 58
 (t)he prohibition of enactments respecting the establishment of religion (does) not bar every friendly gesture between church and state. It is not an absolute prohibition against every conceivable situation where the two may work together, any more than the other provisions of the First Amendment free speech, free press are absolutes.
 
 
 59
 Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 255-56, 68 S.Ct. 461, 486-487, 92 L.Ed. 649 (1948) (Reed, J., dissenting). In my view, these two secular concerns, the safety and security of its citizenry and enhancement of its reputation as an attractive city, justified Philadelphia's expenditures.
 
 A.
 
 60
 Both the district court and the majority have concluded that the primary purpose behind the expenditures was nonsecular and therefore forbidden under the establishment clause. Neither opinion, however, cites evidence of the City's intent in undertaking the expenditures. They rely instead on the rather simplistic assertion that because the platform was used for celebration of Mass and the Holy Eucharist, the City's primary motivation must have been sectarian. See Maj. op. at 929-930; 480 F.Supp. at 1166. This reasoning merely assumes that the justifications offered by the City are pretextual; it fails to explain why the benefit to the Catholic Church was not an incident to the predominant purpose of public safety.
 
 
 61
 Viewed against the recent historical setting available to the City immediately prior to the Pope's visit, the City could have reasonably reached three purely secular conclusions. First, Pope John Paul II's position as head of the Catholic Church, as well as his much publicized personal charisma, would draw a huge crowd of Catholics and non-Catholics to his outdoor appearance at Logan Circle. Second, the safety of the expected crowd, for which the City remained primarily responsible, would be endangered if the Pope were not visible to a large percentage of the persons in attendance. The City argues that its officials wished to avoid "the shoving and pushing" like that which later led to the May 4, 1980, tragedy in Zaire when nine people were trampled to death during the papal visit there.[8] Finally, City officials could have concluded that an essential means of controlling the expectant crowd would be assurance that the Pope would be visible to and heard by the crowd. This conclusion led quite rationally to the purely secular decision to build the platform and purchase sound amplification equipment.
 
 
 62
 The other challenged expenses include money spent on shrubbery and flowers.[9] Although the secular purpose for these expenditures is not as compelling as the desire to safeguard the lives of those in attendance, the City of Philadelphia could have anticipated wide media coverage and desired to make the most of the papal visit's public relations benefit to the City. Because the shrubbery and flowers played no part in the ceremony, the majority's attempt to include them within a class of forbidden expenditures is unpersuasive. In addition, the district court found that these items were totally reusable, and the taxpayer-appellees have suffered no cognizable loss by these particular expenditures.
 
 
 63
 Finally, the appellees emphasize that the Church, not the City, was primarily responsible for distributing tickets for seats close to the platform. This observation carries little weight because the persons most subject to physical peril by crowd disorders were not the persons nearest to the platform, but persons farthest from it. Persons at the rear of the crowd would be least able to see or hear without the platform and amplification equipment, and would be most likely to surge forward, endangering lives at the edge of the crowd. If the City's sole concern were for the safety of the Pope, or even for the dignitaries on or in proximity to the platform, police barricades would have been sufficient. In my view, however, the more difficult security problem was the outlying crowd, and I cannot fault City officials for resolving it as they did.
 
 
 64
 In sum, therefore, I part with the majority's secular purpose analysis in my emphasis on the safety of the crowd, not of the papal visitor. Pope John Paul II's ability to draw excited throngs may or may not be attributable to his religious position, but Philadelphia's recognition of that ability, and preparation for it, is certainly secular. Plaintiff-appellees "have conceded that the visit in its entirety has primarily at least a secular character." Note 2, supra. The religious intent of the City was at most incidental to its primary concern with the safety of its citizens. I do not disagree that the platform was used for a religious ceremony, but the lingering question is what would have occurred in the absence of a platform. Perhaps the Archdiocese would have built a platform; but perhaps, as in Zaire, it would have depended on traditional modes of assuring safety. In Justice Frankfurter's phrase, "(i)n light of these considerations, can it reasonably be said that no substantial non-ecclesiastical purpose relevant to a well-ordered social life exists ...?" McGowan v. Maryland, 366 U.S. 420, 504-05, 81 S.Ct. 1177, 1178, 6 L.Ed.2d 393 (1961) (Opinion of Frankfurter, J.). I must answer this question negatively.
 
 B.
 
 65
 The second part of the test for establishment clause violations is whether the primary effect of the expenditures neither advances nor inhibits religion. In applying this criterion, however, we as jurists should recognize that our guidance comes not from the text of the Constitution, "but (from) our own prepossessions." Illinois ex rel. McCollum v. Board of Education, 333 U.S. at 238, 68 S.Ct. at 478 (Jackson, J., concurring). Application of this criterion is not greatly aided by prior Supreme Court decisions, which "lack ... a principled and logical thread." Public Funds for Public Schools of New Jersey v. Byrne, 590 F.2d 514, 521 (3d Cir.) (Weis, J., concurring), aff'd without opinion, 442 U.S. 907, 99 S.Ct. 2818, 61 L.Ed.2d 273 (1979).
 
 
 66
 In examining governmental action under the primary effect criterion, we do well to remember that "religious institutions need not be quarantined from public benefits that are neutrally available to all." Roemer v. Board of Public Works, 426 U.S. 736, 746, 96 S.Ct. 2337, 2344, 49 L.Ed.2d 179 (1976) (Blackmun, J., joined by Burger, C. J., and Powell, J., announcing the judgment of the Court). Total separation between church and state is neither possible nor constitutionally mandated. See Lemon v. Kurtzman, 403 U.S. at 614, 91 S.Ct. at 2112, Zorach v. Clauson, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952). The proper analysis must determine whether the primary and substantial effect of the expenditure was in aid of religion.
 
 
 67
 Philadelphia's concern with the safety of the throng present for Pope John Paul II's ceremony, discussed supra, was manifested in the expenditures incurred. The absence of disturbances in the unprecedented crowd should not be overlooked. The considerations outlined above that motivated the City to provide the platform and public address equipment support the conclusion that the primary effect of these expenditures was crowd control. The mass would have occurred regardless of the expenditures, but may have been accompanied by tragedy.
 
 
 68
 Like the Walz Court's determination of "minimal and remote involvement" in granting tax exemptions to properties used for religious worship, I believe the same characterization applies to a one-time use of a wooden platform in conjunction with a papal visit to Philadelphia. Although a portion of the Catholic liturgy was performed on the platform, that ceremony consumed only a short period on a single day. It was not repeated like the daily reading of a prayer in a schoolroom. The Court has noted that "(t)he problem, like many problems in constitutional law, is one of degree." Zorach, 343 U.S. at 314, 72 S.Ct. at 684. As Justice Jackson wrote, "(m)usic without sacred music, architecture minus the cathedral, or painting without the scriptural themes would be eccentric and incomplete, even from a secular point of view." Illinois ex rel. McCollum v. Board of Education, 333 U.S. at 236, 68 S.Ct. at 477 (Jackson, J. concurring). Similarly, a secular welcome by Philadelphia to the head of the Holy See, without the pomp and splendor of a papal mass, would also be "eccentric and incomplete."
 
 
 69
 To permit the celebration of a mass in a public place, as the appellees concede we should, but to abjure an elevated platform from which the Pope would be made visible to a million people, or an amplifying system which would carry his voice to them, and to deny the City the right to decorate Logan Circle with flowers, a world-wide symbol of hospitality, is, in my view, sheer sophistry. No constitutional scholar, on or off the bench, has previously defended such a diaphanous distinction. Appellees in this case predicate their challenge to Pope John Paul II's visit on grounds that require the court to examine the fine line closely. They challenge only one-sixth of the City's total expenditures for the two-day visit. They do not challenge the use of public property for the situs of the mass. They question only the labor and materials for the erection of the platform, the planting of shrubs and flowers, and the rental of sound equipment and chairs. I presume that had Pope John Paul II conducted mass at ground level with no chairs or amplification system, there would have been no lawsuit. See O'Hair v. Andrus, 613 F.2d 931 (D.C.Cir.1979).
 
 
 70
 More than a million people attended the gathering at Logan Circle. The papal mass was not solely for the Catholics in attendance and was not the primary purpose of the visit to the city. The commemorative supplement produced by The Philadelphia Inquirer and KYW-TV[10] referred to "the mood of the throngs of Catholics, Protestants, blacks and whites who awaited the Pope" at the mass. This two-or-three hour event deserves the same treatment as other practices previously determined not to have a principal or primary effect of advancing religion, such as the singing of Christmas carols and the commemoration in public schools of Christmas, Easter, Passover, Hannukah, St. Valentine's Day, St. Patrick's Day, Thanksgiving, and Halloween. See Florey v. Sioux Falls School District, 619 F.2d 1311, 1319-20 (8th Cir. 1980), cert. denied, --- U.S. ---, 101 S.Ct. 409, 66 L.Ed.2d 251 (1980).[11] Relative to the impressive security concerns, the religious effect produced by Philadelphia's expenditures in this case is neither primary nor substantial.
 
 C.
 
 71
 I turn now to the issue of excessive government entanglement with religion. The appellees' entanglement analysis hinges on two arguments. First, they emphasize the close contact between the City and Archdiocese in planning for the papal visit, and the exclusive distribution of tickets by the Archdiocese. In light of the safety concerns surrounding the Pope's visit, it is not surprising that the City and Archdiocese worked closely together. What this analysis fails to establish is that any substantial increase in contact arose from the construction of the platform over what would have occurred had the City expended no money other than for police escorts and direct protection. Similarly, the distribution of tickets would seem the normal province of the Archdiocese. In addition, as previously noted, the recipients of tickets were not the people evoking the most concern because they would be able to hear and see without aid, and therefore were not expected to become unruly.
 
 
 72
 The second part of the appellees' entanglement analysis emphasizes the potential for political divisiveness generated by the expenditures. The risk of divisiveness is diminished, however, because of the one-time nature of the expenditures. See Roemer, 426 U.S. at 765-66, 96 S.Ct. at 2353, 2354 (Blackmun, J., joined by Burger, C. J., and Powell, J., announcing the judgment of the Court). The number of plaintiffs has never been an accurate index of political divisiveness, and should not be. Courts are available for dispute resolution; the mere filing of a lawsuit does not connote the extreme political and religious divisiveness with which the drafters of the first amendment were familiar.
 
 
 73
 In my view, the very theory advanced by appellees requires the City to violate the establishment clause. They concede that the platform constructed by the City at the airport did not violate the establishment clause, even though the Pope pronounced a blessing from it.[12] The distinction urged by appellees between the Logan Circle platform and the airport platform would require the City to evaluate "the religious context of a religious organization (and) is fraught with the sort of entanglement that the Constitution forbids." Lemon v. Kurtzman, 403 U.S. at 620, 91 S.Ct. at 2114. It would require a court to engage "in a searching and therefore impermissible inquiry into church polity." Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 723, 96 S.Ct. 2372, 2387, 49 L.Ed.2d 151 (1976). The plaintiff-appellees suggest that the City, or a civil court, assume the role of a liturgical expert, separating out expenditures in support of blessings pronounced by Pope John Paul II and expenses for crowd control during celebration of a mass. The executor of this theory, however, would be required to disallow funds for construction of a platform for the same mass.
 
 
 74
 Judge Leventhal's statement for the United States Court of Appeals for the District of Columbia Circuit in O'Hair v. Andrus is also appropriate here:
 
 
 75
 Appellants conceded at trial and at oral argument that the Pope could be issued a permit to deliver a sermon, arguing that it is the unique religious nature of the Mass that sets it apart. This contention runs counter to the principles of the First Amendment by hopelessly entangling the government with religion. Such a distinction would involve the government in the task of defining what was religious and what was non-religious speech or activity an impossible task in an age where many and various beliefs meet the constitutional definition of religion. The administration of such a test would impermissibly entangle government and religion.
 
 
 76
 613 F.2d at 936 (footnote omitted). The argument advanced by appellees and accepted by the majority would require a governmental entity to examine each activity of the Pope, categorizing each as religious or secular. As this case demonstrates, these distinctions are not clear, and the determinations cannot be made without substantial intrusion by the state in matters primarily religious.
 
 IV.
 
 77
 The court's holding today may have little precedential value in the event of future visits to Philadelphia by the head of the Holy See. It is doubtful that he will return during the lives of those who welcomed him. Nevertheless, I have an abiding fear that this ruling will have a direct effect on government relations with other religious states, some of which receive direct financial aid from the United States. The lesson of the district court, affirmed by this court today, is that governmental finances expended for or on behalf of such nations must always be carefully, if not meticulously, examined to determine the precise portion of the funds that may be devoted to arguably religious purposes. I believe that this examination will excessively entangle the government in religious affairs in the future.
 
 
 78
 Because of the dangers of this excessive entanglement in the case at bar and because the primary purpose and effect of the City's expenditures for the platform were secular, I would order judgment in favor of the City of Philadelphia. Accordingly, I dissent.
 
 
 
 [1]
 As taxpayers, plaintiffs have standing to challenge the expenditures allegedly made in violation of the Establishment Clause. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Plaintiffs were joined in their actions, respectively, by the American Civil Liberties Union and the National Ministries, American Baptist Churches. The district court also permitted the intervention of several individuals under Fed.R.Civ.P. 24(b)
 
 
 [2]
 The trial court found that the City improperly expended the total sum of $310,741 for the Pope's service. The court, however, readily accepted the City's contention that all of the $28,894 spent on lumber, $2,618 spent on bunting, $48,860 spent on shrubbery and flowers, and $5,800 spent on carpeting was recoverd by the City because those items were reusable, apparently without diminution of value. Another $20,000 was subtracted from the total of expenditures as the value of reusable sound equipment purchased by the City. 480 F.Supp. at 1170-71
 
 
 [3]
 The Rev. Mary Anne Forehand and the Board of National Ministries, American Baptist Churches in the U.S.A., also appealed, No. 79-1785 (Notice of Appeal filed November 27, 1979), but that appeal was dismissed pursuant to the stipulation of the parties on March 19, 1980
 
 
 [4]
 The City also argues that the Pope was accorded only what was due him as a head of state, and that the purpose behind the expenditures was to honor a head of state. This argument is, on its face, transparent. The Pope never asserted any diplomatic role during his visit to Philadelphia. Rather, all his activities indicate clearly his religious purpose. Also, the type of aid provided by the City was plainly of a type intended to advance religion, not diplomacy
 
 
 [5]
 Professor Tribe believes the effects test was thus transformed into "a requirement that non-secular effect be remote, indirect and incidental." L. Tribe, American Constitutional Law § 14-9, at 840 (1978) (emphasis in original)
 
 
 [6]
 In note 9, the dissent urges that the City's expenditure on the cross is irrelevant. We disagree. First, only in appellant's brief on appeal was the claim made that the cost was recovered. As an appellate court, we decline to find such a fact when no evidence on the point was offered to the trial court. Second, even assuming that the cost of that particular component was recovered, the City's design of the platform to include the cross and the advance of the funds for its construction are relevant both to the purpose and effect of the City's overall action
 
 
 [1]
 The parties have not raised the issue of mootness. I have assumed that this is a live controversy. I also do not address this court's authority to order performance by the Archdiocese of Philadelphia, not a party to these proceedings
 
 
 [2]
 Counsel for plaintiff-appellees stated at oral argument:
 (W)e have conceded that the visit in its entirety has primarily at least a secular character. That is the arrival at the airport, the platform at the airport where the Pope was greeted by secular officials, bands played, the procession up through Broad Street, all the way up to the point at which the Pope at the head of a religious procession with the forty bishops who helped him go celebrate the mass approached the platform, which was, of course, used for no ... purpose other than the mass and the sermon. Indeed, no secular foot ever touched that platform except the special eight communicants who came upon it to receive the Holy Eucharist. And the religious character ... of the visit, however, is one which is perhaps arguable, but which we don't at all challenge. And indeed, the largest expenditures were for those of crowd control and the like.... (They were) the largest expenditures, ... over a million dollars.
 Transcript of oral argument at 24-25.
 
 
 [3]
 See generally A. Blaustein & G. Flanz, eds., Constitutions of Dependencies and Special Sovereignties, Vatican City State (1976)
 
 
 [4]
 A. Blaustein & G. Flanz, eds., 6 Constitutions of the Countries of the World: Series of Updated Texts, Israel, vol I, pp. 3-5 (1973)
 
 
 [5]
 9 Encyclopedia Judaica Israel 651 (1971)
 
 
 [6]
 The New York Times, October 14, 1980, § A at 9, col. 1
 
 
 [7]
 English translation of Iranian Constitution provided by the Iran Working Group, United States Department of State
 
 
 [8]
 Transcript of oral argument at 52
 
 
 [9]
 The majority's repeated reference to the wooden cross erected at City expense is now irrelevant. The City sold the cross after the papal visit at no financial loss, and it is not included within the district court's order. Appellant's brief at 18
 
 
 [10]
 "Pope John Paul II in Philadelphia," distributed to the court at oral argument by appellees
 
 
 [11]
 Other analogous examples of state action not deemed offensive to the establishment clause include providing non-public school students with textbooks, standardized testing and scoring services, and diagnostic, therapeutic, and remedial services, see Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), non-categorical grants to private colleges, including religious institutions, see Roemer v. Board of Public Works, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), secular textbooks on an equal basis to children attending public and religious schools, see Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), publicly financed transportation for parochial school children, see Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and financial aid to church related colleges for construction of buildings, see Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973). See also Public Funds for Public Schools of New Jersey v. Byrne, 590 F.2d at 522 (Weis, J., concurring)
 
 
 [12]
 See transcript of oral argument at 26